Good morning, your honors. May it please the court and counsel, my name is Richard Stoll and I represent Raymond Eugene Chasten, who is the appellant in this matter. It is an appeal is certain prosecutorial misconduct which took place through statements made during the government's closing argument at trial. In order to place those in the proper context, allow me to give you a brief understanding of the facts of the case. It was alleged during the course of the trial that Mr. Chasten had undertaken to essentially con a wealthy couple out of several million dollars of their money. He used a trust to do so and that during the course of his efforts, he had made known to this couple that he was intending to use their investment in this trust and other matters in order to assist him in bringing his own money into the United States, which at the present time or at the time of the alleged conduct was overseas. It was further alleged in the defense that some of the money or all of the money that was used during the course of the alleged criminal conduct by which the money invested by the complaining witnesses was used to purchase their home and a helicopter from them. It was defended by Mr. Chasten's testimony along with physical evidence and the testimony of several defense witnesses that he had understood the money that was used was a commission that he had obtained for repatriating bonds that were held by a family in the Philippines that those bonds had been issued to in the 1930s and had represented their investment in the Federal Reserve Bank. During the course of the government's closing argument, the government lawyer had indicated that his own personal opinion of that defense by stating and as a government employee, although he didn't reference that in the case, that it was his understanding that the Federal Reserve was a government agency funded by the federal government and thereby with his own personal opinion wiped out the entire defense of the case and followed that as well with other personal opinions as to the- He said he didn't know whether you could bring these, repatriate these funds from the Philippines. Well, that was part of what he said. He made reference in several instances to his own personal understanding that he didn't know if you could repatriate money in the manner alleged by Mr. Chasten. However, he personally didn't think so. Yeah. And that is very significant. In addition, he had also implied that the court did not sanction the defense by indicating that there would be no mention in the court's charge of the money from the Philippines. How did the defense object to this or call this to the judge's attention? Unfortunately, Your Honor, there were absolutely no objections during the course of the government's closing arguments. You're talking about plain error. How can it be plain error if nobody bothered to ask the judge to make a ruling? Well, that is how it is plain error and why we're here asking for the court's plain error analysis and that there had been no objections by defense counsel at trial and the court had not undertaken. Were you the defense counsel at trial? No, I was not. You came in after the damage was done. Yes. I came in after the damage was done. And in this particular instance, in addition to the Well, there is a high standard for prosecutorial misconduct during closing argument, but I think every one of the cases that I've seen, mainly losers, but sometimes winning, every time in those cases the defense attorney did not interrupt the closing argument and raise an objection, I can't recall one where it wasn't a plain error case, but which may explain why most of them are not won. Well, that would make sense, Your Honor. And in fact, in analyzing this case, we also look to see that in addition to vitiating the entire defense through the government's closing argument through personal opinion, there was also vouching for government witnesses, and that was also fairly significant. In the course of Well, was that really vouching or was that just kind of reorganizing their testimony? There had been some conversations out in the hall, hadn't there? Well, yes, Judge. In fact, during the course of the testimony of one individual named Mr. Kuhn, who was actually the trustee of the trust, which was at the center of the prosecution's case, the witness got up and had actually testified in a manner which would have exonerated the defendant, and kept confirming that testimony despite prompting through questioning by the government. During a court-ordered break in the testimony to allow the jurors to stretch their legs, that witness was approached in the hall by an FBI agent and the government attorney. There was some conversation took place, and the witness came back into the courtroom, had then completely done a 180-degree turn in his testimony, now testified to knowledge which he had said earlier they didn't have, which he had said earlier they did have, and had claimed that he had misspoken. And again, the only objection raised was for the asking of leading questions, and there was no further request by the defense to create a record by which this court could review that particular instance. And what we have here is a circumstance in which during the closing argument, the government got up and not only said that that witness offered credible testimony and used that words, I think the witness was credible, this beleaguered and attacked witness, but went on to say that the testimony he had hoped was helpful, and that he personally in his rebuttal had stated that he had thought he might have to wash his hands of this witness, and that he was personally disappointed in the witness's testimony, and further. So this is a case in which the cumulative effect of the ---- Well, he also said that Kuhn had said these same things for many years, and there was no evidence of that. Correct, Your Honor. He had also made statements that, in fact, there had also been confessions by the defendant which were not before the jury. So there were several instances in which the government had made reference to extra record facts or evidence in support of their case which did not exist. At one point during the questioning of FBI Hodges, Agent Hodges, the government had questioned him in regard to a statement that was taken by another FBI agent. The Agent Hodges had and that he had reinterviewed the defendant. There was testimony that there was a one interview, and that a report was made of that interview. Following that, in the government's closing, they made reference to many reports implying that there had been several confessions or statements made by the defendant which would have been consistent with the government's case, or else logically they would not have been brought up. Were there objections made to that? None. Nothing. Not a single objection was made. So we have a circumstance where the court did not give any curative instructions. So when we balance the seriousness of the events or the conduct of the government in the course of vouching for witnesses, of offering personal opinion as to the evidence and the defense in this case, by implying that the court did not sanction the defense in this case because of what would not be included in the court's charge, and we balance that against, one, the curative instructions of which there were none. There was nothing in the court's charge. Well, this really comes down to how bad is it, is what it comes to, in plain error. You know, is it so bad that it warrants a reversal? That's pretty much what it comes down to in plain error, is that you'd have a lower standard if there had been objections. But I assume there may be reasons defense attorneys don't object to these things in closing argument, since there are so many cases where they haven't. And that may be, Judge, however ---- And that may also depend on the extent to which the trial was close without this. Well, that's another point, Your Honor, is that this was not a close case. All of the major witnesses for the prosecution contradicted one another on significant matters. They could not agree on what party from whom they heard the alleged fraudulent misrepresentations to induce their investment. Each of the three main witnesses, the victim, his wife, and Mr. Coon, the trustee, each of which had a different statement as to what would be done with the alleged victim's money, where it would be invested, how returns would be paid to them from what party, whether it was a trust in California, the trust over which Mr. Coon was a trustee, or from the pocket of the defendant, Raymond Chasen. Let me ask you this. How much money was extracted from the Fergusons? $4 million was requested of the Fergusons. It was invested in a trust. Okay. Now, I'll just take this. $4 million. All right. So what happened to that $4 million? $3.2 million of it was used to purchase the Fergusons' home. $3.2 million was used to purchase the Fergusons' home and helicopter. They took $3.2 million of the $4 million and then purchased Ferguson's home. Correct. So Ferguson sold his home for $3.2 million, which was his money. Correct. Okay. That's interesting. All right. Now, then who moved into the Ferguson's home? Mr. Chasen and his family. Mr. Chasen moved in. So if we remove the instances of prosecutorial misconduct. Mr. Chasen moved in. He sat there waiting for the police to arrive, which is inconsistent with criminal without the vouching for the credibility of government witnesses. Okay. So what happened to the rest of the money, the other $800,000, the $800,000? That money was used to pay debts of the trust and for business that was conducted through the trust. And that money And what business was that? There were investments that were purchased that were going to be used to, or pardon me, through the trust to pursue hydroelectric plants. And there were cars that were being purchased and traded for investment purposes. And the debts on those assets were being paid by the trust. And the excuse or justification for purchasing the home for Mr. Chasen, with Mr. Ferguson's money, was that those were commissions on this? Well, the money that was the purpose in purchasing the home was to use the site location for a hydroelectric plant that was on a river. The money that was being used is Mr. Chasen had understood that $8 million worth of commissions had been deposited in the account along with the Chasen's money. There had been testimony that the individual who had accepted the trustee of that California trust, Adventurous Living, had accepted the $8 million and had absconded with it. And there was, in fact, testimony from Agent Hodges that when he attempted to find that individual, that he had disappeared and he could not find him for questioning. Was that $8 million put into an account? Mr. Chasen had understood it had been placed in the account, so that when he put it in the account His testimony was that the money had been paid into the trust. So he had been advised by Mr. Keller, who was a trustee of the Adventurous Living Trust in California, that the money had arrived and been deposited. How was Mr. Keller connected with Chasen? There is no connection between them. Mr. Keller was a trustee of the Adventurous Living Trust in California. Who set up these three trusts? The Parkland Trust was set up by Mr. Kuhn and Mr. Chasen. The Adventurous Living Trust was already in existence, and there is nothing in the record about who actually created that trust. And those were the only two trusts which played a role in the case. There were two other trusts that were also created by Mr. Kuhn and Mr. Chasen, but other than bringing in witnesses to talk about the conduct of Mr. Chasen, they did not play a specific role in the investments or the money in this particular case. So there had been two trusts which were relevant to how the money was used. And one of them we know that Chasen was a trustee. No, Mr. Chasen was not a trustee of any of the trusts. He wasn't a trustee, but he helped set it up. No, I believe that there was some request on his part that Mr. Kuhn create the Parkland Trust, which was the trust that would ultimately be used to operate the hydroelectric plants in Idaho. Okay. So then he got $4 million. What trust did that money go into? That money had been transferred from the Adventurous Living Trust account in California into an Idaho Falls Bank account for the Parkland Trust, and then the Parkland Trust actually purchased the home. So Mr. Chasen did not own it and had no- But he moved in there, lived there. Yes, briefly. And then the hydroelectric plant was going to be built there. Correct. With $8 million. Correct. I believe that there had been an intention for more money to be invested. I don't think that was going to be the limit of the money, but it was the whole purpose of creating these entities was for the purpose of developing a hydroelectric plant business in the area. So we don't know where that $8 million went. That's correct. And had the defense been given an opportunity to rest on its own credibility without extra record statements and vouching of credibility for prosecution witnesses, it may very well be that the defense might have been adopted by the jury in that case. And so the extent and degree of- What was the defense again? Well, the defense was that the money that was actually used to purchase the home through the Parkland Trust had been Mr. Chasen's money, and he had understood it to have been his money at the time, and that there was no intention to defraud anybody or to steal anybody's money. And there were independent witnesses as well, or defense witnesses, I should say. Pardon me. And Chasen said it was his money because he had commissions coming to him? Yes. He had testified that he had had commissions coming to him for the repatriation and redemption of these bonds by a Philippine family for their investment in the Federal Reserve Bank. And that is one of the subjects of the statements that were made in the government's closing in which the personal opinions of the government lawyer represented that he did not personally believe that you could do that and that he always understood that the Federal Reserve was a government agency funded by the government. Okay. Thanks. Thank you. Good morning. May it please the Court. It's a humbling experience to stand before this Court and to answer for my closing argument. I made some mistakes. You weren't very smart about it, were you? I made some mistakes, Your Honor. In the heat of battle. This was a contentious two-week trial with some very experienced counsel. Everything was litigated. The trial lasted for two weeks, and it went on and on. And, you know, sometimes you say things and then you see it on the record, on the transcript, and you say, hmm, I wish I would have said something different. And I apologize. Well, I think it's courageous of you to come here. Can you help us understand why these statements weren't prejudicial? Because, Your Honor, in the context of the case, these statements by and large were side issues. They weren't prejudicial. They were not essential to the defense as counsel has represented. I'd like to make a couple of corrections to a couple of things counsel said. He said that the defense was this money in the Philippines, this $8 million that came in. That really wasn't the defense. The defense was Mr. Chasen testified that there were these trusts, but that he had nothing to do with them, that they were run by the trustee. He said, I didn't want that house. The trustee bought it. And then I moved in. I didn't really want to live there. He said I had nothing to do with that. He said I wasn't around when the money came in from the Pasadena account. I had nothing to do with it. He said that I didn't call the shots. But everybody that testified, all the trustees, said that he called the shots. He set up the trust. He put all the property in these trust's names, apparently to keep his name off of the public record, and so that he could do exactly what he did here, which was blame the trustees for what was going on, instead of taking his own responsibility. He did not say that this was a checkbook error. He just said he had nothing to do with the trust. How important was Mr. Coons? I gather initially you thought he was an important witness. Initially he was, Your Honor. I was stunned when he said what he did during the trial. In fact, I wondered whether we could proceed. But as it turned out, he was not that important. Counsel said that I said that Mr. Coon was credible. I did not say that. In fact, I apologized. I, as counsel said, washed my hands of Mr. Coon and completely backed away from him. I did not say that he was credible. Counsel said that you thought you might have to wash your hands, but then later said that he had said what you said he said for many years. I did, Your Honor. And that was a mistake on my part. I think it might be arguable. The case happened back in 2000. I went to trial in 2006. And it was pretty clear through the trial that it was under investigation for several years. And some of the statements of the original interviews in the case were done in 2000 or 2001. And so I ---- But if Mr. Coons' testimony before the break had stood, how would your case have been? I'm sorry, Your Honor? If his original testimony, which contradicted what he had said previously, off the record, if that testimony had stood, there had never been a recess, and you just ended it, how would your case have been? I don't think it would have been any different, Your Honor, because when he came back in and said, oh, I misspoke, he wasn't very credible at all. I don't think the jury gave him much weight at that point. I mean, it was pretty hollow. And so I think we did the case pretty much without Mr. Coon. Counsel said that there were other confessions that were not in evidence from the defendant. And he said that I made reference to those confessions in my closing. I did not. There was an interview that was done by an FBI agent in Las Vegas. And the FBI agent in Idaho, Agent Hodges, testified that that was a poorly done interview, and therefore Agent Hodges himself did another interview. The party stipulated that the first interview, the one done by the Las Vegas agent that Agent Hodges says wasn't very good, would go into evidence. The other one did not. I made reference to both of them. And I told the jury not to put much weight on that report that had gone into evidence and reminded them because Agent Hodges said it was a poorly done report. But I went a little further and I said that there were other reports. They were not in evidence. I shouldn't have said that. Nicole Coon testified. And I guess what I'm doing here at this point is pointing out a few things that I know that I did wrong that were error. Nicole Coon testified. She was the daughter of Mr. Coon. She created the trust and she created a document at the request of Mr. Chaston that caused the Fergusons to transfer their $4 million from the Pasadena account, where they had sole signature authority, up to this Idaho Falls account, where they had no signature authority. And then the money was spent. I referred to Nicole Coon during my argument as pretty trustworthy. I should not have done that. What I meant was and what I should have said was she gave very detailed information, very detailed testimony about her dealings with Chaston. And Chaston, he simply made a flat denial. I didn't talk to her. I had nothing to do with her. And so what I meant was her testimony was very detailed. It was apparently very accurate. But I should not have used the word very trustworthy. Sybil Ferguson testified. She said that she took notes while she and her husband were talking to Mr. Chaston. She had almost verbatim notes in recollection of what was said by Mr. Chaston, word for word. And what I said was she was dead on. What I should have said was her notes were very complete, as compared with Mr. Chaston's flat denial that he said anything to her at all. And then, as I've indicated, I should not have made the reference to what Mr. Coon had been saying for years. I think there's an inference there that the investigation had been going on for a long time. I've covered all of them except for your own personal views and guesses as to what was right about Philippine repatriation. And, Your Honor, I put that into a different category. I put that into a category of not the best thing I should have said, but probably under this Court's case law perhaps arguable that it was an inference. I think that they all boil down to my using the term I think. And I should have said the government submits. Why is it I think Judge Ferguson or Judge Goodwin asked you a while ago why you think all of those collectively were not really prejudicial, given the strength of your case? Your Honor, these were just a few comments from my closing argument at the end of a two-week trial. And Mr. Chaston was shown to be a complete fraud in the case. And I would submit, Your Honor, that my comments at the end of that trial, these few comments that were arguably not appropriate, did not cause the jury to convict. Mr. Chaston said that he had billions of dollars, that he talked to Alan Greenspan, that he dealt with this outfit called compliance, that he dealt with the feds, that he was going to build hydroelectric dams. He told the trustees to go make offers on multiple properties that never closed. There was never any money in the trust account until the Chastons' $4 million came in, and then he promptly spent it. The evidence was very strong in this case. And Mr. Chaston's sole defense when he took the stand was that I had nothing to do with it. I had nothing to do with this trust. The Philippines was what I referred to as a red herring. They put the evidence on about the Philippines, but that was not the defense. That was not their explanation for what had happened here. They did not argue that this was an accounting error or a bank error. Mr. Chaston said, I had nothing to do with this, and that was the defense. What kind of witnesses did Mr. Chaston have in his defense? He had a couple of his investors, one who had invested $800,000, another one that invested $100,000 and then had another $100,000 into him for something. He had somebody that had worked with him on some coal projects in Wyoming. He portrayed himself as, indeed, a man of wealth and a man that dealt with large sums of money. But I viewed it as kind of a shotgun approach to the defense. They put all this evidence on, but they didn't really tie it together. When he was on the stand, his sole defense was, I had nothing to do with these trusts. The trustee is independent. I did not make these decisions. I did not spend this money. I don't know what happened here. But the evidence showed that he was completely in charge of everything that happened. Thank you. Thank you. All right. The matter will stand submitted.
judges: Goodwin, Pregerson, Reinhardt